# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 16, 2008          Decided March 17, 2009

No. 07-5339

FREDERICK C. DOUGLAS, JR.,
APPELLANT

v.

SHAUN DONOVAN, SECRETARY OF HOUSING AND URBAN
DEVELOPMENT,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 04cv00847)

*Robert C. Seldon* argued the cause for appellant.  With him on the briefs was *Molly E. Buie*.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for appellee.  On the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence* and *Charlotte A. Abel*, Assistant U.S. Attorneys.

Before: GINSBURG, TATEL and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* BROWN.

Dissenting opinion filed by *Circuit Judge* TATEL.

BROWN, *Circuit Judge*: Frederick Douglas, an employee of the Department of Housing and Urban Development (HUD), argues he was discriminated against when his department head failed to recommend him for a highly coveted award. Because this is not an adverse employment action, we AFFIRM summary judgment in favor of HUD.

I.

A Presidential Rank Award, as measured by purse and prestige, is the highest recognition given to federal "senior executives"—high-level career employees. *See* 5 U.S.C. § 4507; 5 C.F.R. § 451.301. There are two types of Presidential Rank Awards: "(1) Meritorious Executive, for sustained accomplishment, or (2) Distinguished Executive, for sustained extraordinary accomplishment." 5 U.S.C. § 4507(c). The number of awards given annually is tightly restricted,[1] and the financial benefits are substantial.[2]

The Presidential Rank Award process is labyrinthine, with numerous ways to fail, but only one to succeed. An

---

[1] *See* 5 U.S.C. § 4507(d) ("During any fiscal year . . . the number of career appointees awarded the rank of Meritorious Executive may not exceed 5 percent of the Senior Executive Service," and "the number of career appointees awarded the rank of Distinguished Executive may not exceed 1 percent.").

[2] *See id.* § 4507(e) ("Receipt . . . of the rank of Meritorious Executive [includes] a lump-sum payment of an amount equal to 20 percent of annual basic pay," and "[r]eceipt . . . of the rank of Distinguished Executive [inlcudes] a lump-sum payment of . . . 35 percent of annual basic pay.").

eligible executive must be recommended by his agency; within HUD, department heads recommend employees to HUD's Performance Review Board ("PRB"), which evaluates the candidates and then forwards a slate of prospective nominations to HUD's Deputy Secretary and Secretary, who—at least formally—decide which candidates will be recommended to the Office of Personnel Management ("OPM"). OPM "review[s] such recommendations and provide[s] to the President recommendations as to which of the agency recommended appointees should receive such rank." *Id.* § 4507(b). The President of the United States makes the final call.

In 1999, Douglas, a black male, became HUD's Deputy Assistant Secretary for Single Family Housing, a "senior executive" position. In November 2002, Assistant Secretary for Housing John Weicher, Douglas's department head, transferred him to a different department. In December 2002, Douglas learned that Weicher had not recommended him for a Presidential Rank Award. Instead, Weicher recommended Margaret Young, a white female, who received an award.

After HUD denied relief, Douglas sued under Title VII, alleging he was discriminated against on the basis of race when Weicher failed to recommend him for a Presidential Rank Award. The district court granted summary judgment to HUD, ruling that Douglas did not suffer an adverse employment action. Douglas appeals; our review is *de novo*, "applying the same standards as the district court." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

## II.

In order to present a viable claim of employment discrimination under Title VII, a plaintiff must show he

suffered an adverse employment action. *See, e.g.*, *Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008). An "adverse employment action" is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). An employee must "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002); s*ee also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (distinguishing between "purely subjective injuries" which are not actionable, and "objectively tangible harm," which is). Further, "[a] tangible employment action in most cases inflicts *direct* economic harm." *Burlington Indus., Inc.*, 524 U.S. at 762 (emphasis added). Thus, "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).

Because "significant" and "objectively tangible" harm is required, performance evaluations ordinarily are not actionable under Title VII; "[t]he result of an evaluation is often speculative, making it difficult to remedy. For example, a single poor evaluation may drastically limit an employee's chances for advancement, or it may be outweighed by later evaluations and be of no real consequence." *Id*. *See also Taylor*, 350 F.3d at 1293 ("[F]ormal criticism or poor performance evaluations are not necessarily adverse actions and they should not be considered such if they did not affect the employee's grade or salary."). On the other hand, "a bonus is a tangible, quantifiable award, more analogous to one's salary or to a benefit of one's employment than to a

performance evaluation. It has a more direct, measurable, and immediate effect," meaning the denial of even a purely discretionary bonus can be actionable. *Russell*, 257 F.3d at 819. At the same time, however, if an employee is denied the opportunity to compete for a promotion, she has suffered an adverse employment action; we do not inquire whether she would have received the position but for the discrimination. *See Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000). Thus, under our precedent, in some cases we consider whether any alleged harm is speculative, but we do not always do so.

The distinction between cases in which, to establish an adverse employment action, we consider the speculativeness of the harm and those in which we do not reflects the difference between a categorical presumption and a causation requirement. Although "we do not categorically reject a particular personnel action as nonadverse simply because it does not fall into a cognizable type," *Holcomb*, 433 F.3d at 902, we have described an adverse employment action as "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision *causing* significant change in benefits.'" *Taylor*, 350 F.3d at 1293 (quoting *Burlington Indus., Inc.*, 524 U.S. at 761) (emphasis added). The first four examples—"hiring, firing, failing to promote, [and] reassignment with significantly different responsibilities"—all relate to one's work responsibilities and position, and are categorically phrased. Although there may be subjective elements to all of these decisions, it is obvious that each significantly changes an employee's status. Consequently, under our caselaw, employment decisions of this type are conclusively presumed to be adverse employment actions, even if any alleged harm is speculative. *See, e.g.*, *Cones*, 199 F.3d at 521.

On the other hand, some actions do not obviously cause a significant change in employment status. The last example of an adverse employment action discussed in *Taylor*—"a decision causing significant change in benefits"—alone requires an employee to explain how the employer's action harmed his employment status. For employment actions that do not obviously result in a significant change in employment status—such as giving a poor performance evaluation, reassigning office space and equipment, or, for that matter, fielding a company softball team—an employee must go the further step of demonstrating how the decision nonetheless caused such an objectively tangible harm. As *Russell* indicates, this additional step (which, by the way, is *not* "newly minted," Dis. Op. at 3, as illustrated by *Russell* itself) requires us to consider whether the alleged harm is unduly speculative. Showing that harm is not speculative need not be a difficult task, and it often is not. For example, a benefit such as a bonus—or, by logical extension, a pay raise—is objectively tangible because it has a "direct, measurable, and immediate effect" upon the employee's compensation. *Russell*, 257 F.3d at 818–19. By parity of reasoning, the loss of a bonus or of a raise likewise has such an effect. Other changes in benefits, however, do not have such a straightforward effect upon employment status. For example, under *Russell*, the effect of a poor evaluation is ordinarily too speculative to be actionable. *See id.* at 818. If, however, that evaluation determines the bonus, as in *Russell*, *id.* at 818–19, and *Weber v. Battista*, 494 F.3d 179, 184–85 (D.C. Cir. 2007), then the employee may show the evaluation caused an objectively tangible harm.

The Presidential Rank Award recognizes extraordinary performance. It is not earned in the ordinary course of employment for adequate or even superior work or for meeting or exceeding established goals. Instead, it is intended

to reward outstanding leadership and innovation—indefinable star qualities that are by their very nature subjective. *See* 5 U.S.C. § 4507(c) (Meritorious Executive Award for "sustained accomplishment" and Distinguished Executive Award for "sustained extraordinary accomplishment"). Failure to make the cut for such an award cannot be deemed a significant change in responsibilities; nor would elimination from the competition affect employment opportunities in an objectively tangible way. Therefore, unlike failure to be promoted, failure to be recommended for a Presidential Rank Award is not categorically an adverse employment action.

Moreover, the inherent uncertainty in the Presidential Rank Award process means there can be no direct tie between a nomination and an award. A departmental recommendation is but a single point in the assessment, one cog in a complex machine. As observed by the district court, "of the thirty-two candidates nominated by their department heads in 1999–2004, only sixteen ultimately received an award." In fact, Douglas himself was recommended but not selected in 2001. Because of the many moving parts involved in selecting a Presidential Rank Award winner—including multiple rounds of independent evaluation both inside and outside of HUD, with a final decision by the President—even if Weicher had recommended Douglas, it is quite uncertain whether the President ultimately would have selected Douglas to receive an Award, rendering any harm from the failure to recommend "speculative" and "difficult to remedy." *Russell*, 257 F.3d at 818. Because a recommendation for a Presidential Rank Award does not automatically or even consistently lead to receipt of one, neither *Russell* nor *Weber* aids Douglas.

In an attempt to escape this reasoning, Douglas cites *Griffin v. Washington Convention Center*, 142 F.3d 1308 (D.C. Cir. 1998). But the adverse employment action in

*Griffin* was obvious: termination. The dispute on appeal was what evidence was appropriate to establish an inference of discrimination, *id.* at 1310–11 (discussing whether the bias of a decision maker's subordinate is admissible in a suit challenging a decision to fire an employee), a wholly separate question than the one at issue here, namely, whether Douglas suffered an adverse employment action when Weicher did not recommend him for a Presidential Rank Award. Douglas also argues that whether Weicher's failure to recommend him resulted in Douglas's not receiving an award should be deemed a question of fact, not law (i.e., he contends the refusal to recommend was an adverse employment action, and a jury should decide if that action harmed Douglas). However, under Douglas's logic, a performance evaluation alone could also be adverse employment action, with a jury deciding whether the evaluation, in fact, harmed the employee. We rejected that notion in *Russell*.

Douglas finally cites *Cones*. There we held an employer's refusal to allow an employee to compete for a job could be actionable because the refusal to advertise the position competitively was "tantamount to refusing to promote him," and failure to promote can be an adverse employment action. *Cones*, 199 F.3d at 521. Douglas argues that Weicher's non-recommendation was tantamount to a denial of a bonus, and thus was also an adverse employment action.

We disagree with this extension of *Cones*. Unlike being considered for a promotion, the question at issue in that case, being recommended for—much less receiving—the extraordinary distinction of a Presidential Rank Award is not an ordinary expectation of employment. Indeed, as explained above, under our precedent failure to be promoted *categorically* is an adverse employment action, meaning unlike with other types of employer decisions (such as giving

a negative performance evaluation), we do not consider whether any alleged harm is unduly speculative. With this distinction in mind, *Cones* should be understood as closing a potential loophole in Title VII. It established that agencies may not prevent minority employees from advancing to higher positions simply by refusing to open positions to competition and laterally transferring higher ranked non-minorities. But that unobjectionable proposition cannot be read to support Douglas's much broader argument: that a Title VII plaintiff has an actionable claim whenever he was not selected to move to the next level of competition for any award accompanied by a prize, even if entitlement is not objectively ascertainable and the decisionmaking is unavoidably subjective. *See Holcomb*, 433 F.3d at 902 & n.2 (explaining that although "employment actions need not fall into cognizable categories to be considered adverse," *Cones* does not abrogate the requirement that a plaintiff must show an action constituted objectively tangible harm). The mere failure to be nominated for such a lofty and rare distinction is insufficient to establish an adverse employment action under Title VII.

In any event, *Cones* is inapposite because the decision whether to promote an employee is made by an *employer* subject—in the most part—to *objective* criteria, *see Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) (acknowledging limited role for an employer's "subjective considerations" but also noting "jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant" notwithstanding use of subjective criteria); it is therefore unremarkable that an employer's decision to foreclose competition for a promotion may be actionable. Here, by contrast, HUD never decides who receives a Presidential Rank Award—the *President* does, based on *subjective* criteria. Douglas, however, cannot sue

the President under Title VII because he is not Douglas's employer. *See* 42 U.S.C. § 2000e-16(c). On the other hand, in *Cones*, the same entity, Cones's employer, decided whom to hire, as well as whom to interview, and how the hiring process would be conducted, making it unremarkable that Cones could bootstrap the agency's failure to allow him to compete to the agency's failure to promote him. Not so with the Presidential Rank Award, where Congress, by statute, has created a decisionmaking process that includes both those inside and outside of an agency, with the final decision being made by the President. Thus *Cones* tells us nothing about the loss of opportunity to compete for consideration by the President, whose unfettered discretion in selecting Presidential Rank Award recipients would not be subject to review under Title VII. Because the ultimate decision to give a Presidential Rank Award is unconstrained by objective criteria and beyond the reach of Title VII, Weicher's decision to not recommend Douglas is also beyond that reach.[3]

---

[3] To be sure, Weicher's decision guaranteed that Douglas would not receive an award. But, given the lack of ascertainable criteria and the boundless discretion of the President, a fact-finder could not determine whether Douglas suffered "objectively tangible harm." *Forkkio*, 306 F.3d at 1131. Indeed, Douglas's lost "chances for a substantial monetary award," Dis. Op. at 2, were so speculative that, with the obvious exception of Young and those few others that were recommended by their respective department heads, any senior executive at HUD with a high annual performance rating (which is to say, every senior executive rated by Weicher), could have brought the exact same claim as Douglas. Just as a poor performance evaluation—which obviously *might* cause harm—is not itself actionable because of inherent speculativeness, failing to recommend a worker for a Presidential Rank Award—which also *might* cause harm—is not actionable, and for the same reason. The dissent quarrels with our causation analysis, arguing it is unclear "what level of certainty the court expects plaintiffs like Douglas to establish." Dis. Op. at 7. The simple answer is that Douglas's

Finally, a few words about the dissent. Though we share his revulsion for racial animus, the secret memo scenario, apparently consequential to our colleague, is not unique to Douglas's case, but could be offered in *any* case where the requirement of an adverse employment action has not been satisfied. If, for example, discovery unearthed a memo stating a supervisor would never give a black person a positive performance evaluation (and if the administrative conciliation process failed to offer relief), our precedent holds that such an evaluation would not be deemed an adverse employment action unless it "affect[ed] the employee's grade or salary." *Taylor*, 350 F.3d at 1293. In this regard, our colleague's quarrel is not with us, but with the adverse employment action requirement itself. We'll let him fight that battle alone.

Likewise, while conceding that *some* non-subjective "harms" are not adverse employment actions, "such as those threatened by negative performance evaluations," the dissent seems to suggest (without saying so directly) that *Russell* was wrongly decided, or at least that it should be read narrowly, more as a statistical blip than a doctrinal principle. Dis. Op. at 2. We think the court in *Russell* was correct. Just as the harm resulting from a single performance evaluation viewed in isolation is speculative, *cf. Weber*, 494 F.3d at 184–85, so too is it speculative whether Douglas would have received a Presidential Rank Award had he been recommended. Douglas cannot show he suffered an objectively tangible harm because he cannot show that losing the opportunity to

---

chance at winning a Presidential Rank Award was entirely uncertain. That is enough to dispose of this case. *Cf. Weber*, 494 F.3d at 184–85 (pattern of receipt of bonuses based upon prior positive evaluations established causal link); *Russell*, 257 F.3d at 818–19 (causal link established by showing bonus followed automatically from positive evaluation).

compete significantly changed his employment status. The same cannot be said of the loss of opportunity to compete for a promotion; under our caselaw decisions relating to one's work responsibilities and position like "'hiring, firing, failing to promote, [and] reassignment with significantly different responsibilities'" categorically are adverse employment actions. *Taylor*, 350 F.3d at 1293 (quoting *Burlington Indus., Inc.*, 524 U.S. at 761). Hence, the dissent just gets it wrong: in both precedent and principle, there *is* a meaningful distinction between eliminating an employee from consideration for the Presidential Rank Award and eliminating her from consideration for a promotion or job opening.

As Douglas cannot show he suffered an adverse employment action, we AFFIRM the grant of summary judgment.[4]

*So ordered.*

---

[4] Because the exhaustion requirement, though mandatory, is not jurisdictional, *see Munsell v. Dep't of Agriculture*, 509 F.3d 572, 581 (D.C. Cir. 2007); *In re James*, 444 F.3d 643, 647–48 (D.C. Cir. 2006), we do not decide whether Douglas adequately exhausted his administrative remedies.

TATEL, *Circuit Judge*, dissenting: Imagine that discovery in this case had turned up a memo from Frederick Douglas's former supervisor, John Weicher, expressly stating that he would never nominate a black person for the Presidential Rank Award. Under this court's holding—that disqualification from competing for a lucrative employment award is not an adverse employment action—Douglas would have no recourse to Title VII even in the face of such direct evidence of discriminatory intent. Because this result cannot be squared with Title VII, and because there is no principled difference between the hypothetical case and Douglas's with respect to the only issue we address today—whether Weicher's rejection of Douglas qualifies as an adverse employment action—I respectfully dissent.

It is true that "'not everything that makes an employee unhappy'" is actionable under Title VII. Maj. Op. at 4 (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)). Indeed, even given an openly discriminatory memo, Douglas would be unable to sustain a Title VII discrimination claim for a "[p]urely subjective injur[y], such as dissatisfaction with a reassignment, or public humiliation or loss of reputation," *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002) (citation omitted), or for a negative performance evaluation unconnected to a financial or other benefit, Maj. Op. at 4. But Weicher's rejection of Douglas as a contender for the Presidential Rank Award was far more tangible than any of these merely ego-bruising actions—it definitively closed Douglas's only available door to an award equal to 35 percent of his salary. Thus when Douglas lost the opportunity to compete for this valuable employment-related award, he experienced "materially adverse consequences affecting the terms, conditions, or privileges of employment . . . such that a reasonable trier of fact could find objectively tangible harm," *Forkkio*, 306 F.3d at 1131.

To be sure, we have recognized that some harms, such as those threatened by negative performance evaluations standing alone, may be too speculative to constitute adverse employment actions. *See* Maj. Op. at 4 (citing *Russell*, 257 F.3d at 818). The reasoning underlying that principle, though entirely correct where applicable, has nothing to do with this case. As we explained in *Russell v. Principi*: "The result of an evaluation is often speculative, making it difficult to remedy. For example, a single poor evaluation may drastically limit an employee's chances for advancement, or it may be outweighed by later evaluations and be of no real consequence." 257 F.3d at 818. In this case, by contrast, we needn't speculate at all as to the negative consequences of Weicher's rejection of Douglas's candidacy. It represented the final word, irremediably foreclosing Douglas from competing for the award. *See* Appellee's Br. 18 (conceding that the "non-nomination . . . took [Douglas] out of the running" for the award). Unlike a "single poor evaluation," which merely adds to the overall mix of information in an employee's personnel file, *Russell*, 257 F.3d at 818, Weicher's rejection had the direct and immediate effect of terminating Douglas's chances for a substantial monetary award. No future action could mitigate this adverse impact and render the rejection "of no real consequence," *id.*

The proper analogy is thus not to a negative performance evaluation, but rather to excluding a candidate from the selection process for a promotion or a job opening, either of which would qualify as an adverse employment action. Like hiring and promotions, the Presidential Rank Award involves a formalized, multi-layered selection process for a specific, tangible employment benefit—a significant sum of money. This case is thus much like *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000), where we held that refusing to allow an employee to compete for a job opening qualified as an adverse

employment action without regard to how likely it was that the employee would actually be hired. We neither asked how many other individuals would have applied for the job nor required the employee to show that he would automatically have been the successful candidate. We simply reasoned that "refusing to allow [an employee] to compete" for a benefit is "tantamount to refusing" to grant the benefit. *Id.* So too here. Refusing to allow Douglas to compete for the Presidential Rank Award was "tantamount to refusing" the award.

Seeking to avoid the obvious implications of *Cones* for this case, the court attempts to distinguish the Presidential Rank Award selection process from selection processes for hiring and promotions. Relying on oft-quoted language in *Burlington Industries, Inc. v. Ellerth*—"a tangible employment action [for purposes of vicarious liability] constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," 524 U.S. 742, 761 (1998)—the court says there is a difference between actions "related to one's work responsibilities and position" like hiring, firing, failing to promote, and reassignment, and "decisions causing [a] significant change in benefits." Maj. Op. at 5–6. According to the court, actions in the first category—hiring, firing, failing to promote, and reassignment—"are conclusively presumed to be adverse employment actions, even if any alleged harm is speculative," *id.* at 5, as are decisions relating to such actions, like the refusal to allow an employee to compete for a promotion in *Cones*, Maj. Op. at 12. For the second category, however, the court offers up a newly-minted strict "causation requirement" applicable only to employment benefits: "a decision causing [a] significant change in benefits . . . alone requires an employee to explain how the employer's action

harmed his employment status," *id.* at 6. Under this new rule, for decisions such as refusal to hire or promote that cause an employee to lose out on a better job, rejected candidates need show only that they were eliminated at some point in the process. By contrast, for decisions that cause an employee to lose out on an employment benefit, rejected candidates apparently must now prove that they would have ultimately received the benefit had they not been eliminated at an earlier stage of competition. Because receiving the Presidential Rank Award represents a change in benefits rather than a change in work responsibilities or position, *id.* at 6–7, the court concludes that denial of the opportunity to compete for the award doesn't qualify as an adverse employment action unless the employee can show that he would have otherwise received the award, *id.* at 11–12.

The distinction the court draws fails to hold up. The court nowhere explains why actions related to "one's work responsibilities and position," *id.* at 5, fall more squarely under Title VII's ban on discrimination in "compensation, terms, conditions or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), than do actions related to, for example, work hours, vacation time, bonuses, or any other employment benefit. *See George v. Leavitt*, 407 F.3d 405, 410–11 (D.C. Cir. 2005) (explaining that the Title VII provision governing federal employers, 42 U.S.C. §2000e-16(a), is construed in terms of the provision governing private employers, 42 U.S.C. §2000e-2(a)). Nor is it clear whether the court means to include all employment benefits in its disfavored category now subject to the causation requirement. The court seems to place pay and bonuses in the benefits category. Maj. Op. at 6. But why? Surely pay directly "relate[s] to one's . . . position," so why wouldn't pay decisions, just like promotion decisions, categorically qualify as adverse employment actions without regard to how speculative the ultimate harm? For that matter,

why doesn't the Presidential Rank Award also "relate to one's work responsibilities and position"? After all, the award is based on an employee's achievements in carrying out his work responsibilities and is calculated as a percentage of the salary for his position.

In any event, regardless of where the court draws the line, *Burlington Industries* provides no support for treating benefits differently from position and work responsibilities. Every item on *Burlington Industries*' non-exhaustive list refers to the end result sought: a new job, retention of one's job, a promotion, or a decision causing a significant change in benefits—here the President's decision to award a substantial sum of money. If definitively barring a candidate from consideration for one of these desired outcomes constitutes an adverse employment action—as the court acknowledges with respect to promotions—then barring a candidate from consideration for any of them does.

Not only does the court's distinction find no support in *Burlington Industries*, but it makes no sense. For example, suppose an employer asks line supervisors to nominate candidates for one available high-level vacancy and separately for one available bonus. Now suppose a line supervisor refuses to nominate a minority employee for either the promotion or the bonus, and two white employees are ultimately chosen. Under the court's "causation requirement" the minority employee has suffered an adverse employment action as to the promotion but not as to the bonus. The minority employee would now have a Title VII claim related to the bonus only if she could show that had the line supervisor not excluded her she would have received the bonus over any of the other nominees. Nothing in Title VII or in our Title VII cases even hints that the statute provides less protection for employees adversely affected by decisions involving money

than for those adversely affected by decisions involving promotions.

The court does acknowledge that because bonuses and pay have "a 'direct, measurable and immediate effect'" on compensation, the loss of a bonus qualifies as an adverse action. Maj. Op. at 6. Yet the court fails to explain what it means by "loss of a bonus." Does "loss of a bonus" refer solely to the final decision such that a bonus is actionable only if an employee can show that she in fact lost the bonus, i.e. that she would have received it but for the employer's action? If so, then it leads to the arbitrary result in the hypothetical above. Or does "loss of a bonus" include loss of the *opportunity to compete* for a bonus such that an employee eliminated from competition has suffered an adverse employment action regardless of how likely it was that she would actually receive the bonus? If so, the court's reasoning defeats its conclusion in this very case—surely an employee who obtains an award worth 35 percent of his salary in recognition of his work accomplishments has experienced as direct, measurable, and immediate an effect on his compensation as does an employee who receives a less substantial bonus. "By parity of reasoning," *id.*, loss of the award through elimination from competition "likewise has such an effect," *id.*

Perhaps the court means to limit its causation requirement to employer actions, like the single performance evaluation, that on their face have no obvious connection to any particular selection process. But even for such actions, I see no basis for distinguishing between hiring, firing, failing to promote, and reassignment on the one hand, and other employment benefits on the other. Nothing in our negative performance evaluation cases indicates that the analysis of an evaluation's impact differs when the employee is worried about her ability to get a future promotion rather than a future bonus or raise. Surely

the court does not mean to suggest that the recipient of a negative performance evaluation need no longer show that the evaluation in fact played a role in taking her out of the running for a job or promotion.

Not only is there no basis for requiring a different showing for employment benefits than for promotions, but the court's causation analysis gets it backwards. We know from *Cones* that the question isn't whether absent the employer's action the plaintiff would have gotten the benefit, but rather whether as a result of the employer's action the plaintiff could not. *Cf. Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002) (negative performance evaluation constitutes adverse employment action when plaintiff received bonuses "*nearly* every year previously" (emphasis added)). Performance evaluations generally do not conclusively terminate an employment benefit selection process; Weicher's elimination of Douglas from the Presidential Rank Award process did.

Nor is it clear what level of certainty the court expects plaintiffs like Douglas to establish. After all, Douglas's hope for the Presidential Rank Award was hardly a pipe dream: in the year Weicher rejected him, two-thirds of those nominated received awards, Appellant's Reply Br. 3–4. What greater showing is now required at the summary judgment stage to permit a reasonable jury to infer that Douglas would have received the award?

In support of its conclusion that Douglas failed to meet its flawed causation requirement, the court focuses on the highly selective nature of the Presidential Rank Award, stating that "[u]nlike being considered for a promotion, . . . being recommended for . . . the extraordinary distinction of a Presidential Rank Award is not an ordinary expectation of employment." Maj. Op. at 8. Yet much like promotion

opportunities, the Presidential Rank Award is offered annually, and all career Senior Executive Service members with three or more years of service are eligible to compete. Appellee's Br. 2–3 (citing 5 C.F.R. § 451.301(b)). For eligible Senior Executive Service members, then, competing for a Presidential Rank Award is indeed an ordinary expectation of employment—or as the statute puts it, a "privilege[] of employment," 42 U.S.C. § 2000e-2(a)(1). Nor is it relevant that the Presidential Rank Award represents a "lofty" award, Maj. Op. at 9. If prestige determined the scope of Title VII, employers could refuse to hire or promote minorities into the most desirable elite positions, yet Title VII clearly covers such positions, *see, e.g.*, *Stewart v. Ashcroft*, 352 F.3d 422, 426–27 (D.C. Cir. 2003) (recognizing that non-selection as chief of section in the Department of Justice constitutes an adverse employment action).

Further seeking to distinguish the Presidential Rank Award from other employment decisions that involve similar selection processes, the court emphasizes that the President, as the ultimate decision-maker, enjoys unfettered discretion and is immune from suit, Maj. Op. at 9–10. But Douglas is not suing the President for denying the award; he's suing his employer, the Secretary of Housing and Urban Development, for terminating his candidacy for an award calculated as a percentage of his HUD salary and paid for with HUD funds, Appellant's Opening Br. at 2. True, Weicher lacked ultimate authority to grant the award, but he did have authority to ensure that Douglas was excluded—a power he exercised to Douglas's irreparable detriment.

Finally, the court says that promotion decisions are "subject—in the most part—to *objective* criteria" while the Presidential Rank Award is based on subjective criteria. Maj. Op. at 9. Yet we have long recognized that promotion and

hiring decisions often turn on subjective criteria, *see Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) ("[E]mployers may of course take subjective considerations into account in their employment decisions . . . ."), and such decisions nonetheless remain subject to Title VII. Moreover, it is far from clear that the Presidential Rank Award process is in fact divorced from objective criteria. For example, "an exceptional record of achieving important program results," Saul Ramirez Decl. Attach. B at 7, would likely involve objective accomplishments such as Douglas's claim that he increased single family home ownership, Appellant's Opening Br. at 11. But even were the award criteria entirely subjective, relying on such criteria to pick award recipients is no different from relying on subjective criteria to choose between two job candidates with indistinguishable objective qualifications, *cf. Aka*, 156 F.3d at 1298 (hiring decision based on the purely subjective criteria of "enthusiasm" when objective criteria did not clearly favor selected candidate), or from hiring decisions for jobs such as speechwriter or graphic designer that by their nature are highly subjective.

By focusing on the subjectivity of the award, the court exposes the fundamental flaw in its decision: it conflates the question of whether Weicher's disqualification of Douglas was sufficiently adverse with the ultimate question of whether it was motivated by discriminatory animus. That the Presidential Rank Award recognizes subjective "star qualities," Maj. Op. at 7, may make it more difficult for Douglas to show that Weicher rejected him because of race, but it has nothing to do with whether Weicher's decision is the *type* of employment action Title VII seeks to rid of discrimination.